May it please the Court, if I could reserve five minutes for rebuttal? You certainly may, out of your allotted 30 minutes, but you must keep your own time. Understood. In this case, the California Supreme Court ordered an evidentiary hearing on the question of whether Petitioner Thomas's trial counsel rendered ineffective assistance of counsel in the guilt phase of his trial in failing to corroborate a defense witness named Vivian Searcy. That's the only issue before this Court. After a lengthy evidentiary hearing was held in the State court, the referee made adverse findings to Petitioner, including finding some of the witnesses he had presented to be not credible, finding a number of others to be tainted by information supplied by the Petitioner's habeas investigator, and then those witnesses, and also finding some of the evidence he offered to be inadmissible under State law. The referee's recommendations were then forwarded to the California Supreme Court, which reviewed the matter and concluded that Petitioner had failed to sustain his case of ineffective assistance of counsel. Specifically, while the Court found that through a reasonable investigation, counsel could have been able to locate three additional witnesses, the failure to do so did not undermine confidence in the trial outcome in light of the speculative nature of the testimony that those witnesses could have provided in light of the fact that counsel had a reasonable tactical basis for not calling one of them, and in light of what the California Supreme Court characterized as the near certainty of appellant's or Petitioner's guilt on the underlying matter. Scalia. Well, counsel, what version of Section 2254 are we going to apply in this case? This is pre-AEDPA? The petition was filed pre-AEDPA with unexhausted claims and exiles. A mixed petition filed pre-AEDPA. After briefing an argument in the district court, the district court concluded that a number of the claims, including this claim, was unexhausted and ordered Petitioner to go back to State court. Petitioner then the he amended his petition to dismiss the unexhausted claims, including this claim. State proceedings were held. It came back. This claim was added back in in a fully exhausted fashion. So we've raised the issue in our brief that given the unique posture of this case, that AEDPA standards should apply. However, and at the time we filed our brief, that was an open question. That's no longer an open question, is it? In Smith v. Mahoney, a panel of this Court did conclude that a petition in a similar posture as this one, that pre-AEDPA standards should apply. And we've acknowledged that in our brief. We've argued that that conclusion in Smith v. Mahoney was made without analysis. It simply took the statute of limitations analysis, which we think is different, and applied it to the case. Well, regardless of whether it was well-reasoned, poorly reasoned, or not reasoned at all, it is a holding that we're bound by. And for my next question, I want you to assume that this is a pre-AEDPA case. That's fine, and I'm prepared to do that. And my question is whether, in your view, there's any pinholster issue with regard to the taking of evidence here. I would assume the answer is no, both because it was done in State court and because it's pre-AEDPA, but I just want to get your thought on that. I would agree. There's no pinholster issue. For the additional reason that Petitioner presented no additional – never asked to present any additional evidence to the district court once we got to the district court, the parties agreed that this matter would be decided on the record that was created in the State court and only on that record. I'm rather curious about your response. Are you suggesting that your position would be better if AEDPA did apply? Well, I think that the standard of review in AEDPA is more favorable as a general rule. I think that that's not a question. In light of Smith v. Mahoney, I understand that that was characterized as a holding of the court. And we constructed our entire brief on the assumption that pre-AEDPA standards apply. That is, that we prevail under the pre-AEDPA standards that exist in the State courts. And how are we to treat factual determinations made by the State courts? Those findings are presumptively correct under pre-AEDPA law unless one of the seven circumstances identified in Townsend v. Sane applies. And really the only argument in this case is whether those findings are fairly supported by the record. Petitioner contends they're not. We contend that they are. Well, you contend, I think – well, maybe you don't. Because part of the State court's finding was that trial counsel was, in fact, ineffective, leaving aside the prejudice question that counsel did an improper, not good enough job of the investigation and should have found, in their view, three additional witnesses. So do you accept those findings as being supported? We do not contest those findings in Federal court. Well, I would appreciate your discussion as to why even those three witnesses wouldn't have made a difference. The defense basically was, I did not commit this crime, and I have a plausible alternative person who might very well have committed this crime, who was seen arguing with the victims, who was present at the Rainbow Village on the day of the murder, and so on and so forth. And the prosecutor's main argument was, why would you believe this loony woman who's homeless and uses drugs? And the whole focus was on whether her testimony was corroborated. Why wouldn't even two or three witnesses corroborating the existence, location, and potential motives of James Bowen have made a difference? The answer, Your Honor, is because those two or three witnesses did not corroborate the existence, location, or potential motive of the mysterious Bowen. And the reason I say that is as follows. First of all, I think it's important to look at who those three witnesses are and to look at it through the filter of what a prejudice showing has to establish under scrutiny. We have to look at it the way a jury would have looked at it, right? Because the question is whether it would have affected the verdict. Correct. And the end is, as Harrington v. Richter has recently reminded us, the prejudice showing has to be substantial, not just conceivable. And that's the nub on which this case turns. So turning to the three witnesses, but you don't look at that in isolation as well. You look at the strength of the State's case. Which was, in my view, speaking only for myself, not that strong. You had no forensic evidence linking this defendant. You had no witness to the crime. You had no motive for the crime. You never proved that it was his rifle that was the murder weapon. So it, you know, you're going to have to convince me that it was strong. Understood. Let me – and those are, you know, two essential prongs of this argument. You assess the showing that Petitioner made at the habeas proceedings, and you assess that against the strength of the State's case. You were going to tell us about each of the individual witnesses and why their testimony does not help Thomas. Correct. Correct. Please proceed. Yes. Let's start with the witness named Klaus Van Wendel, the fellow that lived on a boat in the area. Defense counsel actually had a police report of Mr. Van Wendel. He did not interview Van Wendel before the guilt phase. He did have an investigator interviewing him. It's common ground that the first prong of Strickland was violated, right? Correct. But the State's – So let's not go into that. Except that – I'll be happy to do so. The Supreme Court did find a reasonable practical justification for not putting him on the stand. So even though they found that counsel could have found and interviewed him, they also found that he had a valid reason for not looking further when he read the police report, which had detailed this incident where Thomas, shortly before the murders here, had brandished a machete, threatened to kill a woman, and had an argument with Van Wendel. But I understand what the Court's asking. But didn't Van Wendel testify that Bo came around to his boat and removed some objects which could be niffins? No. That's what – that's how Petitioner is characterizing his testimony. Van Wendel did not know Bo. At the time – I didn't put that in my question. Say that again. I didn't put that in my question. Okay. Well, I'm sorry. I misunderstood. Didn't Van Wendel testify that there were some objects left on his boat which Bo came to pick up, or some man who was – Some man. Some man came to pick up, which could have been Bo, right? Could have. It was a man that – Weren't those objects, at least circumstantially, the victim niffins? I don't believe so. And – Tell me about that. The reason that – what was in there were some books. There was some identification that was neither in Niffin's name – it was like a driver's license. It was – the name is in the record, I believe. But it was not Niffin's name. It was not Bo's name. It was somebody else's identification. And then there was – Give me a record reference as to the name of the driver's license, because my – I thought that the driver's license was of an out-of-state driver to which Niffin was from Ohio, with long hair to which Niffin had long hair. So that there was some identification of Niffin's goods at Wendel's boat, picked up by Bo. Well, as the Court knows, the record is voluminous, and – Yeah, but you told me that the ID was of someone not Niffin. I believe that that's in the record. If the – Take a look at it. Maybe your colleague can take a look at it and give me that page citation, because that would be important. If it was Mr. Wombat, it would not help Mr. Thomas. If it was Mr. Niffin, it would. There's no evidence that the words Greg – I can say with confidence that it was never identified as Greg Niffin. No, but that's not what you said. I understand that. You said it was somebody else than Niffin, if I understood you. That's correct. That's what I said. And I'll either confirm that or tell the Court that I can't confirm it. What about the syrupy that was found? So the syrupy is another one of the pieces of morphing evidence. At the evidentiary hearing, Mr. von Wendel testified that it was a blanket-like material. That has now become taken for granted because of a declaration that the referee found potentially tainted by a habeas investigator. It's taken for granted that that was a syrupy. Whether you call it a blanket-like material or a syrupy, here's the important fact. It doesn't corroborate Vivian Searcy. She never described Greg Niffin as wearing a syrupy. In fact, she testified that he was wearing a plaid shirt. And there is a citation on that point at, I believe, at page 2516 of the Excerpts of Record. A plaid shirt is not a syrupy. So the fact that other witnesses testified that they had the other of the deadhead witnesses said that Greg was occasionally wearing a syrupy, doesn't corroborate Vivian Searcy. I mean, the problem to me seems to be that you're taking each one in isolation. If the group of witnesses all had testified, they could have been permitted to corroborate one another if the other two – I mean, this isn't actually the case, but if the other two witnesses that the California Supreme Court identified had said this is what he was wearing, they would be mutually corroborating. I agree, and that's not the case. They don't – the reason that the reason that the reason that the reason that the But at a minimum, there's – well, I'm not going to argue with you, but would you also continue to answer the question about the other two witnesses, in particular, Cho? Certainly. And the witnesses offer bits and pieces of testimony that's supposed to corroborate what Vivian Searcy says, so that's why I think it's legitimate to look at those bits and pieces. They don't corroborate each other. The argument is, well, here's a bit, there's a bit, you look at it as a whole. Well, they corroborate at a minimum that Bo existed and he was there on the day of the murders. I mean, the argument of counsel at trial was, who knew if Bo even existed? This woman is crazy and not to be believed. And all of these people either identify Bo or a person who has that nickname who looks approximately like what she described. And again, I don't accept that the record supports that. They corroborated that there was a, they established, and we accept, that a person named James Bowen was a member of the deadhead community. Now, is that He was white and blond. Is that the person that Vivian Searcy saw? Okay. Vivian Searcy says she doesn't know this person, she doesn't know his name, she can't explain how she came up with the name, and her entire description, her entire description is that he was a brown-haired, and then she more, then she after that described him as blond, a brown or blond-haired man who was about 6 feet tall. She doesn't, and who had stringy hair that looked like it needed to be combed. That's also at page 2516. We have no description of age. We have no description, Petitioner continually says in his, in his brief that the witnesses would have corroborated that her testimony that a man with a blond ponytail who was a member of the deadhead community was there. Vivian Searcy never tied him into the deadhead community. She never testified that he had a ponytail. You have a blond man of uncertain age and size arguing with, with a person that, that Vivian said that could be Mary, and when shown a picture that could have been Mary, and that the picture resembled Greg Niffin. So I, I don't accept that Petitioner has ever tied up James Bowen to the person that Vivian Searcy saw. In other words, we know that there were lots of people in and out of, of, of Rainbow Village. It's not a situation where, where this is a, an area where there were, you know, the prosecution's case was dependent on there being two people ever visiting this area. We know that there were. But your ending that case depended on showing Vivian to be a liar. That was the theme of about 30 pages of the prosecution closing argument. In fact, the very last thing that the prosecutor said to the jury was that her testimony was ridiculous at best and perjurious at worst. That was the final word. That was the theme of the prosecutor's argument. And so even if there's not a certainty that, that the person she saw was the same person, it would have certainly lent credibility, wouldn't it? I, I would, I would disagree. Certainty, I, I think it, it's, it doesn't get beyond the realm of speculation. And speculation cannot establish prejudice in the, in the Strickland showing. We know that there were, were, were several dozen, you know, fairly permanent residents of, of, of, of Rainbow Village. But Vivian Cersei was not one of those. She had only been staying there a few days with her boyfriend, Harry Shorman. We know that there were as many as two dozen deadheads. And then there was testimony that Vivian Cersei testified. Lots of people were coming in, in and out of the village that night. And then the Court, Your Honor has asked whether the, the prosecution's case, case was dependent on showing that Vivian Cersei was a liar. I'll agree that the prosecutor argued that Vivian Cersei was a liar. Extensively. And with good reason. He had a witness, Vince Johnson, who said that Vivian Cersei, less than a month after the, the murders, told him that she was making up everything she said. And he later recanted, correct? I don't accept that it was recanted. He gave a declaration that then when he was deposed, he said that everything he testified to at trial was true. So I don't see how that's a recantation when he said in hindsight, his declaration is he says in hindsight, you know, maybe I was misinterpreting what Vivian was saying in light of, in light of what I knew about Harry Shorman. But then when he is later deposed, he reaffirms his trial testimony. And furthermore, Petitioner, who had the opportunity to present Vince Johnson at the evidentiary hearing, never did. Nor did he introduce his deposition in testimony. So now he's trying to add this declaration and, and into the mix of, of a showing that he never sought to make to the State court. You've told us what your, what your criticism of Von Wendell is as a corroborative witness. Correct. You brought up Vince Johnson. Mr. Cho testified to a prior consistent statement of Cersei. Do you want to take on Mr. Cho? Mr. Cho testified. I don't believe he did testify to the consistent statement of Cersei. Cho was the one who said that he talked to Cersei. No, he talked to Bo, but the swimming in the water comment. Oh, pardon me. There was, there was another witness who testified that talked to Cersei the day after, and she told a story consistent with what she told on the stand. Yeah, that was James Royster. Royster. I'm sorry. A witness who was discredited by the, by the, by the finder. Let me talk about Cho. I do want to talk about Royster as well. Happy to talk about each of these witnesses. Mr. Cho's swimming in the bay comment, he was interviewed by, he, he was around, the reason the Supreme Court found that counsel could have found him, he was around Rainbow Village and there was evidence that he, he hung around there after the murders, unlike, you know, most of the deadheads who, who, who scattered. Mr. Cho was interviewed by the police. They had a statement from him in which he didn't mention this, this, this swimming in the bay comment. So I think now to Did he ask that? He was asked what he knew about the murder. I mean, that's always the, the argument. Well, gee, I, I had this, this, this, this little nugget that would have been probative and I didn't mention it because the police didn't ask it. And it's always an argument. And it's, it's frequently one that's, that's easily rebutted. When someone is asked what they know about an incident and, and they don't tell, that casts light on the persuasiveness of their later statement. The same criticism can be leveled at Mr. von Wendel, who didn't tell the police about the, the incident with the bag on the, the, the boat when he was talked to. Instead, he tells them about Thomas, Thomas, you know, waving the machete and, and threatening to kill someone. So we have witnesses who, not by petitioner's counsel, but were interviewed by the police who don't, who give statements that would have clearly been used to impeach their later statements of, of, that are alleged to somehow incriminate Boe. And then I guess what, what one really has to ask is, is a statement, I was swimming in the bay last night, is that statement, does that tie Boe into a murder? It gets shoved in the, in the ribs by Sutherland? Or Sutton? Yeah, Sutton. And, and, and, and the observer, Cho, is, is, is, you know, seeking to draw inferences from, or petitioners seeking to draw inferences from what, what a, a, a, a shove in the rib means. I would argue, it's our position, that that is, is such a speculative type of assessment that, that I would, I went swimming in the bay last night, that, to now get to the point of saying that is a statement that should be used as evidence of an admission of third-party culpability is far beyond the, the, the pale of, of what a prejudicial Strickland showing would establish. And furthermore, the State referee found that that was a hearsay statement. He, he admitted it in, but ultimately when he made his ruling in his findings and report to the court, he declared that that was hearsay. We've cited State law to this Court that that is within the realm of a referee. We, we don't throw out the rules of evidence when we have these reference hearings. We, we, a petitioner has to undermine the showing that was against him, and that means he has to have an admissible evidence. I just want to understand your position, and I know this isn't exactly this case, but I just want to understand your view of State law. If a defendant presents a witness who says Joe Smith told me that he was the one who committed these murders, is that inadmissible for the defendant who is not Joe Smith? There are, there are two prongs that have to be, have to be showed. One is that the person, the statement has to so far be contrary to the individual's culpability that, that he wouldn't have made it unless it was true. So you, usually I killed Joe Smith is going to be enough, unless even I killed Joe Smith might not be enough if we know that the person, if the declarant was in prison in Florida and we can establish his whereabouts there at the time that Joe Smith was killed in California. But the second prong, so it has to be a statement that you would look at it and say, yes, nobody would make a statement like this unless it was inculpatory. We argue that the, I was swimming in the wave. What's the second prong? It isn't such a statement. The second part is there has to be a showing of unavailability. Typically, that occurs when you, when the person is called and takes the Fifth Amendment. I mean, that's how you, otherwise it's a pure hearsay statement that can be manufactured and can't be tested by the State. And that's a crucial flaw in all of the hearsay statements that Petitioner tried to present to the State court. Mr. Engler, you're down to five minutes. All right. Let me just conclude with that. Petitioner, Petitioner's investigator admitted that he located James Bowen. But they didn't tell us. We looked for him, too. We never found him. They didn't tell us. They refused to disclose where they located him. They refused to interview him. They refused to make any showing whatsoever. So located who? James Bowen. Oh. And it's in the State evidentiary record. The citations are mentioned in our brief. So they absolutely failed to make any showing of unavailability. Without that, those statements are inadmissible under State law, and the referee found them to be inadmissible. It's the only ruling of State law we have in this case. And we don't think that the district court was free to disregard that. And even more important, you cannot undermine the State's case with inadmissible evidence that you would not be able to introduce at trial. I'll save the rest of my time for rebuttal. You may do so, counsel. We'll hear from Mr. Cutchins. May it please the Court. I'm in the unaccustomed position of representing the appellee. Would you please introduce yourself for the record? Yes. I'm A.J. Cutchins. I'm A.J. Cutchins, and I'm here representing the appellee, Ralph International Thomas. And, of course, the Court has covered much of what I had planned to say. But I'll start with Luna v. Canberra, in which this Court concluded that it's hard to conceive how a criminal defendant is not prejudiced when his attorney wholly fails to investigate evidence that he was not at the scene of the crime and that another man was guilty of the crime with which he was charged. Counsel, before you go there. Yes, sir. The threshold question, of course, is to what extent the Federal court is bound by the findings made by the State court under 2254. And I'd like to have you address that, and particularly the standard that I discussed with Mr. Engler. I think that what Mr. Engler said was accurate, that the State court findings of fact, if they are indeed findings of fact, are presumed correct unless they are not fairly supported by the rule. Well, help us sort out what are findings of fact that are subject to that rule with respect to the issues that are focused here. Okay. Well, we can, I suppose, start with the finding of fact regarding hearsay. It was labeled by the referee as a finding of fact that three of the statements, not including the adoptive admissions with his companion, Leslie Sudduth, that, contrary to what Mr. Engler said, was not part of the referee's finding. But that three of the statements would be inadmissible hearsay. That's what he made as a finding of fact. He did not make an evidentiary ruling that any of those statements were a hearsay. In fact, at the hearing, every time one of those statements was made, the State of the State proposed a hearsay objection, and in each case, the referee ruled on that hearsay objection by overruling it. He denied every single one of the hearsay objections. Afterwards, he made what was dubbed a finding of fact that they would be, that all of those would be inadmissible hearsay. To the extent that that's a finding of fact, it has to be that the referee overruled the objection, but then at the end, he said, they are hearsay, so I'm going to strike them with the record. He did not strike them from the record. He did prove it. But he upheld the objection. That's not so unusual. He did not uphold the objection. He never struck them. He never said he was upholding the objection. He made a finding of – frankly, he rubber-stamped a finding of fact that was proposed by the State that if offered a trial, they would have been inadmissible hearsay. That's quite different than making a verdict. I mean, very often in trial, the judge will allow the evidence in subject to a motion to strike and subject to an objection. Is that what happened here? No, it is not. Well, yes, it is that he offered it in subject to a motion to strike, but no motion to strike was made. The evidence was never struck. He didn't purport to strike the evidence. All right. So that's – He made a free-floating legal determination. All right. But so far as where that leaves the State court determination, which we need to look to under 2254, what result? Two things. One is that it's quite clear that that finding of fact wasn't adopted by the California Supreme Court. Why do you say it's quite clear? Because contrary to what the State says, every single one of the – the State court discussed every single one of those statements on their merits. It gave no indication. It gave no indication that it considered them hearsay and dealt with them on their merits. What do we – is it a finding of fact to which we should defer if supported by the record that only three of the witnesses out of the 11 would have been found? Is that a finding of fact, that a reasonable investigation would have uncovered three of the witnesses but not necessarily the other eight? To answer honestly, Judge Graber, I don't think that's a finding of fact. I think that that's a mixed question. That's not a historical fact. That's an extrapolation. But I'm willing to meet it as a finding of fact and say – And the question of prejudice, is that a conclusion to be drawn from what? What is that? And how do we review it? That – I think the precedent is very clear that the finding of prejudice is a mixed question of law and fact, which is reviewed de novo by this Court. I think Strickland and his progeny are very clear about that. Just the last thing about the hearsay is that as a finding of fact, it was insupportable. We can say with reasonable certainty that the evidence would indeed have been admitted and any hearsay objection overruled. We know this because the same hearsay objection was indeed made at Petitioner's trial. When Vivian Searcy testified regarding what Boe said to the victims on the fatal night, the prosecutor objected on hearsay grounds, and the judge, Judge Byers, who actually tried the case, overruled that objection. He did so on grounds that are equally applicable to each of these statements. There's no reason to think that he would have ruled differently. The second time around. A statement against criminal interest?  It was a hearsay exception statement against criminal interest? What he ruled is that it demonstrated the state of mind of the speaker, Boe. And before I move on, in terms of unavailability, he did that and he admitted the statements. So what I'm saying is if that was, as the referee posed it, a finding of fact, it is not supported by the record. Those statements would have been admitted. And frankly, Judge Beyer, I agree. Those were statements against criminal interest. As for the unavailability of that declarant, in actually in the record before the referee, Petitioner's counsel offered to show the unavailability of James Bowen. And the referee said, no, I'm going to admit the statements. I don't need to hear that offer. I'm going to admit them over the hearsay objection. I'd be glad to give you the record cite to that. Do you agree with the counsel for the State that the defense met, interviewed and knew the whereabouts of James Bowen? Well, even the State didn't say that the State, that the defense interviewed. Well, they knew where he was. A, right. But the, what Mr. Engler refers to as the investigator, who was actually a paralegal who put together much of the case, had a pretty good idea of where to find James Bowen. He testified that he did not go see him because he was afraid for his life. Did he communicate with the prosecution the whereabouts of James Bowen so they could have sent a sheriff to interview him? My understanding is that he was in another State. And I don't believe that he communicated with the prosecution. Frankly, the prosecution was, you know, the adversary in the proceeding. And I'm oh, I don't know. I don't know what James Bowen said. The answer is no. Right. The answer is no. He did not. The defense knew where Bowen was and didn't tell the prosecution. The, at the reference hearing, yes. They thought they knew where he was. They never confirmed that. Was there any explanation with respect to why nothing further was done with respect to Bow? If they knew that much. By whom? Done by whom? By defense. By defense. The explanation was that the paralegal who was doing the investigation was afraid to go see him. And that's all we know. That's all we know. All right. I want to get back to where this started, which is what would have been the effect in this case if defense counsel had done anything to corroborate the naked testimony of the eccentric homeless woman who testified about Bow that night? What the important starting place that the State has never acknowledged nor sought to dispute is that as it was, the jury had great difficulty reaching a guilty verdict in this case. Even the anemic defense that was presented to the jury, including Vincent Johnson and all of that, even with that, the jury spent as much time deliberating, five days deliberating, that's as much time as they spent hearing all of the guilt phase evidence. During those five days, they focused on the account given by Vivian Searcy regarding the tall, blonde-haired deadhead with a backpack. The jurors asked for readbacks of her testimony and of the other evidence regarding the deadheads. It's true that she did not say he was a deadhead. She said she saw him talking to two other people who were identified as deadheads next to the dead-on bus. So I don't think that that leap was exactly a distant one to make. As Judge Patel concluded, and as the State has never controverted, by every established objective criteria, this was a very close case. I think Judge Graber laid out why. In Rios and Alcala, this Court held that the State's case was at best very close, where there was no physical evidence linking the defendant to the crime. There was no weapon found, no fingerprints, no gun powder residue, no DNA evidence. But unlike those cases, this was weaker still. There was no eyewitness. There was not even a respectable theory as to why Mr. Thomas would have wanted to kill those people. But if there were no defense witness at all, wouldn't there be enough for a circumstantial case? If there were no defense? If there were no defense? You mean, are you asking, Your Honor, if the State's case passed the test of Jackson v. Virginia? Yes, exactly. I have great hesitation in answering yes, but I have to assume arguendo that it did. Well, that's what Judge Patel said. Our argument, sure. That's what Judge Patel said. She said perhaps, actually. She basically said, assuming that it was. Right. But if all of the – but I will submit that if the evidence that was not developed had been submitted, that the two cases would have been pretty close to equipoise. I think that the circumstantial evidence suggesting that Bowe did the killing was at least as strong. So the difference being, contrary to really the basis of the State's argument, we don't have to prove that Bowe did it. And the defense didn't have to prove that Bowe did it. But aren't you stuck with Searcy as the witness, who was very weak, contradictory, vague, did not survive cross very well? I wouldn't say that she was terribly contradictory. And, yes, we were. But the point Your Honor is making, I think, really bolsters exactly our case. Yes, we were stuck with Vivian Searcy. And because of who Vivian Searcy was, the prosecutor got to get up and say without challenge that she was making it up, that she invented the whole thing. The tall, blonde-haired man she called Bowe was a figment of her imagination or her boyfriend's. She dreamed it up so that the authorities would put them up in a motel. There was nothing to challenge that. Now, as the Court has noted, even the California Supreme Court acknowledged that there were several witnesses known and available to trial counsel who would have testified that among the very small handful of deadheads at Rainbow Village that night, there was indeed a tall, blonde man known as Bowe who had fled with his backpack. Vivian Searcy talked about him having a backpack that he pulled out of the bay the following day after the first body was discovered. At that point, with just that modest quantum of evidence, the jury would have known that the alternative perpetrator really existed, that contrary to what the prosecutor argued, Vivian Searcy did not just make it all up. But even those witnesses who the State says are indisputably available would have given the jury far more potent testimony. Let me talk about Klaus von Wendel. He would have testified that a tall, blonde man known to him as Bowe had left a backpack on the deck of his boat. Inside the backpack was a driver's license with an out-of-state driver's license mentioned by Judge Bea, and a pair of shoes and a Mexican-style blanket or sarape. Now, witnesses other than Ms. Searcy testified that that night, before he was murdered, Greg Niffen was wearing a Mexican-style blanket. He certainly had shoes. Neither of those were recovered with his body. Klaus von Wendel identified at the hearing a picture of James Bowen as the person who had come to his boat that day. He knew him as Bowe. As to what he told the police, we know that immediately after they talked to Klaus von Wendel, they issued a bulletin asking for the Santa Cruz police to stop a silver knife murder. So the inference is that he, in fact, mentioned it. But putting that aside, even if he did not say the word Bowe, his testimony would have been enough to corroborate. Ms. Searcy chose testimony that in the middle of talking with Mr. Cushman's Yes. Who testified that Niffen was wearing a sarape and shoes? That was in the original trial testimony. It was in the case-in-chief. Yes, it was in the case-in-chief. And if Your Honor would like, I can submit a citation to it after the hearing. I'm sorry, I don't know that right off the top of my head. Would you do that? But there's never been a dispute about that. Would you please do that at the request of Judge Baer? Yes, Your Honor. Cho would have testified that he talked to Bowe that day. In the midst of the conversation about the murder, Bowe bizarrely said, this was when they were talking about the murder, said he'd been swimming in the bay that last night, the bay, of course, being where the bodies were dumped. And Bowe's companion elbowed him, gave him a look. They fled Rainbow Village forever. I submit that nobody can be confident that the jury would have reached the same verdict that they had heard from those indisputably available witnesses. The State court's findings regarding the other witnesses being unavailable are not supported by the record for reasons laid out very clearly in Judge Patel's order. Neither the referee nor the State supreme court ever dealt with the testimony of five witnesses, one of them a sitting judge. Judge Patel was a judge who had worked in the public defender's office and who said without dispute, never impeached, never controverted at the reference hearing, we would have found those people and we would have found them quite readily. One of them, of course, being Bernie Royster, who would have testified to the consistent account that Vivian Searcy gave him the day of the killing about Bowe. The State claims that Mr. Royster's testimony was not credible, because the referee said so. The referee said so based on reading a transcript of his prior testimony. The referee, of course, was in no better position to make that call than anyone else, but the larger problem, you know, the State contends that all of the witnesses were not all of the witnesses, but that the bulk of the witnesses were somehow tainted or by their credibility was tainted. The credibility findings of the referee really suffer much less than the credibility  They have much the same defects as the hearsay finding, and we've traced most of those in our brief and in the 28-J letter. For now, we'll just note that the California Supreme Court did not, with one or two specific exceptions, accept or adopt those credibility findings, and if they had, they could have dispensed with most of their opinion, if they really rejected the bulk of the evidence on credibility grounds. It could have saved a lot of paper and a lot of effort. It dealt the California court dealt with those witnesses' testimony on their merits. Mr. Cutchins, what do you find wrong with the California Supreme Court opinion which garnered six of seven votes? What do you find wrong with that opinion which garnered six of seven votes? Cutchins, where to start? I said where to start. The the for for current purposes, the big thing that I find wrong is their is their conclusion, which is subject to de novo review, that there was no prejudice. And to get there, as we've said, you don't even have to get to any of their facts. You can accept all of their factual findings and just go on the testimony of Cho and von Wendel. Even on that testimony, which they accepted without any hearsay problem or credibility objection, they there would have been enough to tip the balance in this very, very close case. This jury was was was poised, if they had had anything to make them believe that Vivian Searcy was telling the truth, that would have been enough. Well, as I read the opinion of the California Supreme Court, it said that all the proffered corroborative evidence of which you've mentioned didn't undermine any of the circumstantial evidence against Thomas, and therefore, it the failure to produce it did not prejudice Thomas. What's wrong with that? There is, Judge Bea, I believe, a big logical defect in that. What you just said would be true of any case involving an alternative perpetrator, where you have a bunch of circumstantial evidence against one, one, the defendant who is one potential perpetrator, and without touching any of that, there is a mass of evidence that someone else did it. It was true in Alcala and Rios and Luna v. Canberra. And it's going to be true in any case where the defense was somebody else did it. Also, the evidence actually did touch some of the circumstantial evidence. One of the four or five key points that the California Supreme Court relied on was that Mr. Thomas owned a rifle, which, although it was never found, never identified as the murder weapon, could have been the murder weapon. The evidence that was developed suggests that, in fact, what the Boe and the victims were arguing about was a rifle that had been stolen, that to that extent undercuts. I don't think that's a major point, but the larger problem with the California Supreme Court's reasoning in the regard that you just mentioned is their assertion that the evidence was overwhelming, that this was overwhelming evidence against Mr. Thomas, and that the evidence on the other side, you know, couldn't possibly have overcome this overwhelming showing. This Court has seen overwhelming evidence of murder. You know, over the decades I've been doing murder cases, I've certainly seen overwhelming evidence of murder, where the murder weapon is found with the defendant's fingerprints, where the defendant's tire trucks are found at the scene of the crime, where the defendant confesses, where four people identify. None of that was here. This was, at best, a weak circumstantial case, and the California Supreme Court's or the majority's assertion to the contrary, I think, really brings disrepute on their opinion. I would like to touch a couple of points, just correct a couple of points that I think are not true, that Mr. Engler touched on in his argument. Regarding the, regarding there not, there being lots of people at Rainbow Village, the evidence, and here I do recall the site, at Excerpts of Record 1496, the evidence was that there were a minimum of five and no more than 15 or 20 dead heads at Rainbow Village that night. The State, in its argument, in its brief, suggests that Vivian Searcy just made up the name Beau, and wouldn't that have, to describe the tall, blond man with the backpack who she saw, wouldn't that have been quite a coincidence that among that tiny handful of people who were there that night, there happened to be another tall, blond man with a backpack named Beau? Contrary to what the State argues, Ms. Searcy did not say, she never said that she made up the name. She didn't say that to trial counsel. She didn't say that. She didn't testify to that at the hearing. What she said is, I'm sorry, I've got it right here. I refer to him as Beau. That's the only thing I know him as. And that's, again, what she said to trial counsel. The State's entire argument is that that means she made it up. I'd say that, putting aside her slightly odd way of expressing herself, the plain meaning of, I refer to him as Beau, that's the only thing I know him as, is that she didn't know the man personally, didn't know his actual name. She knew him as Beau. The State suggests that she made it up. That would have been a coincidence. The State also speculates, that's the word they use in their brief, that perhaps someone else put her up to using that name. But isn't the more logical inference that during the time that Vivian Searcy and James Bowen had both been living in the fairly small Rainbow Village community, she had heard him referred to as Beau? Because that's what everyone called him. Do you know him? No, I don't know him. I just, you know, I just call him Beau. It really doesn't matter. She testified that the man that she identified as the apparent perpetrator was Beau. All of the other witnesses would have testified that the man who fit her description, who fled, who made various inculpatory statements, the tall, blonde man with a backpack, they knew that man as Beau. That would have been far more than enough to corroborate Vivian Searcy's testimony and to change the outcome of the case. I see my light is on, so I will try and wrap up now. I'd say that the fundamental defect in the State's argument is this. To succeed, the State has to show that none of what really is a mountain of evidence, all of which points to Beau, and thus corroborates the otherwise naked defense, that none of it is to be believed. It is not surprising that the State seeks now to atomize it, because if any of it, if any of it was presented to the jury, there is at least a reasonable likelihood that it would have tipped the balance in a closely balanced case, because it would have defeated the prosecutor's argument that Vivian was just making it up. The State's argument depends on the true – I understand your – the potential, but I don't quite understand the likelihood. Why are we to conclude that it's likely? We are to conclude that it's likely based on two things. One is, as I've said, as it was, even with the weakness of the case, even with Vincent Johnson's testimony, the jury had a really hard time coming to the verdict that they did. The verdict that they did come to followed the prosecutor's argument that Vivian Searcy's testimony was a complete fabrication, showing – and that she made up the man named Beau –  The fact is, that this person, the juror Robert Packpack, who fled Rainbow Village the day after the killing would have been strong corroboration. That's – that is enough. You know, the question is, can we be confident that the jury, if they had known that, would have reached the same verdict? Can we really be confident that if they had known that she wasn't just making it all up, they would have reached this – that verdict? I mean, Luna v. Camber certainly says no, but I don't see how logically it can be said. The State's whole argument depends on the truly bizarre hypothesis that all of these witnesses were just making it up, that nearly a dozen people, some of whom didn't know each other, some of whom really disliked Mr. Thomas, showed up from all over the country to testify to a massive confection of lies. The State makes much of the witnesses, quote, drugs so fast, and the minor drug convictions that some of them suffered in their youth. But when they testified on Mr. Thomas's behalf, these folks, they were looking at middle age. They had families. They had professions. They had businesses. They had absolutely no reason to lie or exaggerate or make things up, and good reason to tell the truth. They came to testify, and they came to tell the truth because there is very good reason to believe that the State of California is trying to execute a man, Ralph International Thomas, for two murders that were, in fact, committed by someone else. If the State is so convinced that Mr. Thomas committed capital murder, let the judge hear the evidence. If the judge is so convinced, then the judge will give an unfair trial with competent counsel in which the jury hears all of the evidence. Your Honors, unless you have any other questions. Roberts. No further questions. Thank you very much, Mr. Cutchin. Cutchin. Thank you. Mr. Engler, you have some reserved time. Mr. Engler, before you start, I'm interested in this matter of the defense discovery, the whereabouts of Bowen. How should we deal with that? What's the significance of that? How does it cut? What does it do? Well, here is where I would say it has significance. And I will go directly to the remarks that Mr. Cutchin used to sum up. This is not a case about innocence. There has never been a claim of innocence. Mr. Cutchin succeeded in striking from our answer to the district court additional evidence that we raised in the habeas investigation and discovery that tended to strongly inculpate Mr. Thomas. The district court said this is irrelevant, what came up later, because we have to look at the trial record and decide whether that's prejudicial. I accept that. I accept that for the purpose of this finding. But you can't now smuggle in and say Jackson v. Virginia insufficiency, a claim never made with respect to guilt, only made with respect to first degree v. second degree. You can't smuggle in a Jackson claim and you can't smuggle in an actual innocence claim. Beyond that, I make of it, you know, no more than that. We asked for the location. We asked for the notes that would help us to locate Mr. Bowen. They were not provided. When did this location take place? I'm not sure. It would be in the testimony of Mr. Barnes, James Barnes, at the reference hearing, at the evidentiary hearing in State court. That's where the discussion of this takes place. Let me go ahead. If evidence that Bowen did it were producible by the defense in advance of the evidentiary hearing before the California Supreme Court, and that evidence were not produced, an inference could be drawn. I would agree with that. I suppose you are. Contrary to the defense. One looks at the logical steps that a defense could have taken. The logical step is to locate this man and interview him. They decide we don't want to interview him. We're afraid of him. Accepting that at face value, why would you then not divulge that information to the State so that we could interview him? You could make an inference from the failure to interview logical witness, the failure to produce logical witnesses, that the witness would not have supported your theory. And that's a standard inference. If he really did it, would he come in and confess? I mean, that's the inference you're suggesting, because otherwise, what would happen? It's not the inference I'm suggesting. I'm suggesting, why wouldn't you give the State the opportunity to interview this witness? Why wouldn't you? Maybe he would have taken the Fifth Amendment. I would have thought that the defense would have loved to have him take the Fifth Amendment before the referee. I mean, it's a logical step that wasn't taken. If I could, I have a citation to the record on the name on the license, Judge Bea. At ER 41, which is also page 1270, I believe, of the State Supreme Court's opinion, it states that Von Wendell referred to the name as Brian or Bryant that was on the license. And that was his testimony at the evidentiary hearing. And if I could, let me just finish with this. The serape is another example of sort of a statement, a case that's presented to the court, this court, as a fact that was not presented to the district court, to the referee. Von Wendell testified. He testified at ER 583 to 585. They had an opportunity to have him describe this material. He never referred to it as a serape. He said it was a blanket-like material. To now say that, well, they proved that Greg was wearing a serape, which Vivian never testified to, and that Von Wendell saw a serape, it's just not true. It's not in the record. And that's why it is important to go piece by piece, look at our record citations, look at the Petitioner's record citations. We invite the court to do that. And when you do that, to conclude, as Petitioner argues, that this was an equally balanced case, in our view, it was not. It was, as the State Supreme Court correctly said, there was a near certainty that Thomas was guilty, and that was not undermined by the showing that Petitioner made in the hate case. Thank you very much, counsel. Your time has expired. The case just argued will be submitted for decision by the Court, and we will take a 10-minute recess.
judges: O'scannlain, Graber, Bea, Cjj